IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

NOSTRUM LABORATORIES, INC.,        )
and NOSTRUM PHARMACEUTICALS,   )
LLC,                                                      )
                                                             )
                         Plaintiffs,              )
                                                             )
vs.                                                      )        Case No. 16-01040-CV-W-ODS
                                                             )
BALBOA CAPITAL CORPORATION,    )
                                                             )
                         Defendant.            )

ORDER AND OPINION (1) DENYING PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT, (2) DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT, (3) DISMISSING COUNT III
OF PLAINTIFFS' FIRST AMENDED COMPLAINT, AND
(4) DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY

Pending are Plaintiffs' Motion for Partial Summary Judgment (Doc. #79),
Defendant's Motion for Summary Judgment (Doc. #81), and Defendant's Motion to
Exclude Expert Testimony and Opinions of Dr. Nirmal Mulye (Doc. #83).[1]  For the
following reasons, Plaintiffs' motion for partial summary judgment is denied, Defendant's
motion for summary judgment is denied, and Defendant's motion to exclude expert
testimony is denied.  Pursuant to Plaintiffs' concession, Count III (reformation based
upon mutual mistake) of Plaintiffs' First Amended Complaint is dismissed.


I.        **BACKGROUND**[2]

Nostrum Laboratories, Inc. is principally engaged in the pharmaceutical business.
From 2007 to the present, Nostrum Laboratories has operated a Kansas City, Missouri
facility that manufactures generic pharmaceutical products.  To manufacture drug

_____

[1] To simplify, the Court refers to Plaintiffs and Defendant, and not Plaintiffs-
Counterclaim Defendants and Defendant-Counterclaim Plaintiff.
[2] Unless otherwise noted, the facts contained in this section were uncontroverted by the
parties or were obtained from pleadings or exhibits submitted with the parties' summary
judgment briefing.  These facts are set forth to provide background information for the
Court's ruling only, and should not be construed as findings of fact.

products, Nostrum Laboratories acquires and operates equipment through leases and other means.  Since 2012, Nostrum Pharmaceuticals LLC has owned all shares of Nostrum Laboratories.[3]  Balboa Capital Corporation is a financing company.

On August 1, 2011, Donald F. Henson, Jr., then a Vice President of Balboa, sent a lease proposal to Frank Ann, then Controller of Nostrum Laboratories, and Anil Anand, then-Chief Financial Officer of Nostrum Laboratories and financial adviser to Nostrum.  Doc. #82-8, at 2-4.  Referring to their discussion, Hansen sent a proposal to Ann with what Hansen believed met Ann's expected parameters.  *Id.* at 2.  The initial lease proposal sent to Nostrum Laboratories did not contain language about a lease purchase agreement, a buy-out for a nominal fee, or buying the equipment at the conclusion of the lease.  Doc. #82-8, at 3-4.  Also, the initial lease proposal did not mention return of equipment, payment of a residual, or payment of the fair market value of the equipment.  *Id.*; Doc. #89-4, at 11-12.

During the course of the next month, Anand and Ann regularly communicated with Hansen about the proposed lease transaction.  According to Anand and Ann, throughout these discussions, they discussed a "capital lease" with Hansen, and referred to financing and buying the equipment at the conclusion of the scheduled lease payments.  Doc. #89-2, at 6; Doc. #89-3, at 3.[4]  The parties seem to agree a "capital lease" is a finance lease that provides the lessee with an option to purchase the equipment at the conclusion of the lease agreement.  Doc. #81-18, at 9; Doc. #89-2, at 6; Doc. #89-3, at 3.

On September 6, 2011, Hansen sent Ann a proposed master lease agreement for signature by Manesh Dixit, Nostrum Laboratories' then-Chief Operating Offer.  Ann sent an email that same day asking about a typographical error in the proposed agreement.  Ann's email did not include anything about purchase of the equipment, a buy-out, or an amount for a buy-out.  In another email sent the same day, Ann asked for revisions to the proposed agreement and asked about the yield rate, which, according

---

[3] This lawsuit is brought by Nostrum Laboratories, Inc. and Nostrum Pharmaceuticals, LLC.  When referring to both Plaintiffs, the Court will use "Nostrum."  Otherwise, the Court will refer to the individual entities.
[4] Neither party points to anything in the record indicating Hansen disputes Ann's and Anand's representations of what was discussed during these conversations.

to Ann, is only relevant when the parties are discussing cost of acquisition.  In this second email, similar to the first, Ann did not specifically refer to purchase of the equipment, a buy-out, or an amount for a buy-out.

Eventually, Balboa and Nostrum Laboratories entered into a master lease agreement ("agreement") to lease equipment.[5]  Doc. #82-12.  In the agreement, Balboa is defined as the Lessor, and Nostrum Laboratories is defined as the Lessee.  The portions of the agreement upon which the parties base their summary judgment arguments are as follows:

> **1.  LEASE.**  Lessor shall lease to Lessee and Lessee shall lease from Lessor the items of equipment and other personal property (hereinafter, together with all replacements, repairs, substitutions, additions, accessions and accessories therefor and/or thereto, called the "Equipment") described in the Schedule(s)…now or hereafter from time to time executed by Lessor and Lessee and made a part hereof, all upon the terms and conditions hereinafter set forth as supplemented with respect to each item of Equipment by the terms and conditions set forth in each Schedule.
>
> **2.  TERM.**  Each Schedule shall become effective upon acceptance by Lessor by signing and dating each Schedule and the term for any Schedule(s) shall commence on the day the leased property has been delivered to and accepted by Lessee ("Commencement Date")….  The base term ("Base Term") of each Lease shall commence at the Lessor[']s sole discretion on any day occurring in the quarter following the Commencement Date and terminate upon the expiration of the number of months specified in each Schedule.  Each Lease may be terminated by Lessee at the end of the base term if one hundred twenty (120) days prior to the end of the base term, written notice of such termination is delivered to Lessor via certified mail.  Each Lease may be terminated by Lessor at the end of the base term if at least sixty (60) days prior to the end of the base term, written notice of such termination is delivered to Lessee via certified mail.  Otherwise the term of each Lease shall automatically be extended for six months following the end of the initial base term at the rent stated on the respective Schedule(s), and shall renew thereafter for successive three month periods until notice of termination is provided by Lessee.  During the initial extension period, Lessor, at its sole option, may terminate each lease upon ninety (90) days prior written notice to Lessee via certified mail.  After the initial extension period, each Lease may be terminated by either Lessor or Lessee at the end of any calendar month,

---

[5] The agreement was signed by Nostrum Laboratories on September 6, 2011, and was signed by Balboa on November 23, 2011.  Doc. #82-12, at 4.

provided that ninety (90) days prior written notice of such termination is delivered to the other party via certified mail.

**3.  RENT.**  The rent payable with respect to any Schedule(s) shall be the amount shown on such Schedule(s).  Lessee shall pay to Lessor the rent for each Schedule, in advance, for each period or any part thereof that each Lease is in effect as delineated on the Schedule.  The first such payment, with respect to any Schedule, shall be made at the Lessor[']s discretion on any day occurring in the quarter following the Commencement Date….  Lessee agrees to pay taxes and reasonable fees, including but not limited to documentation fees, filing fees, credit fees, equipment inspection fees, title fees, property taxes, sales taxes, use taxes, business taxes and further agrees to pay twenty dollars ($20.00) per collection call and one hundred dollars ($100.00) per collection visit. Lessor may apply remittances received to unpaid rental installments and/or other charges on a due date basis, remittance received being applied to the oldest unpaid rental or charge.

**4.  FINANCE LEASE STATUS.**  The parties agree that this Lease is a Finance Lease as defined by Section 10103(a)(7) of the California Uniform Commercial Code ("UCC").  Lessee acknowledges the following:  (a) Lessor has not selected, manufactured, or supplied the Equipment; (b) Lessor acquired the Equipment or the right to possession and use of the Equipment in connection with the Lease; (c) Lessee has received, reviewed and approved all written Supply Contracts (as defined by UCC Section 10103(a)(25)) covering the Equipment purchased from the Supplier (as defined by UCC Section 10103(a)(24)) thereof for lease to Lessee on or before signing this Lease Contract (as defined by UCC Section 10103(a)(12)); (d) Lessor has informed Lessee in writing of the identity of the Supplier; (e) Lessor has informed Lessee that Lessor may have rights under the Supply Contract and that Lessee is to contact the Supplier for a description of any such rights, and; (f) Lessor provides no warranties or other rights with respect to the purchase of the Equipment and any and all rights Lessee has with respect to the purchase of the Equipment are solely against supplier, and Lessee may communicate at any time with the supplier prior to executing this Lease.

**9.  OWNERSHIP.**  The Equipment…shall at all times be and remain, the sole and exclusive property of Lessor, and Lessee shall have no right, title or interest therein or thereto except as expressly set forth in this Lease. Plates, labels or other markings stating that the Equipment is owned by Lessor shall be affixed to or placed on the Equipment by Lessor or, at Lessor's request or if required by law, by Lessee at Lessee's expense, and Lessee shall keep the same in a prominent position thereon.

4

**10. PERSONAL PROPERTY.** The Equipment is, and shall at all times be and remain, personal property notwithstanding that it or any part thereof may now be or hereafter become, in any manner affixed or attached to, or embedded in, real property or any building thereon. Lessee agrees that it will furnish and record, at its own expense, such owners', mortgagees', landlords', or other disclaimers, waivers, or consent as may be necessary or reasonably requested by Lessor in order to give full effect to the intent and provisions of the preceding sentence.

**14. LOSS, THEFT AND DAMAGE.** Lessee shall at all times after signing this Lease bear the entire risk of loss, theft, damage or destruction of the Equipment from any cause whatsoever, and no loss, theft, damage or destruction of the Equipment shall relieve Lessee of the obligation to pay rent or to comply with any other obligation under this Lease. In the event of damage to any part of the Equipment, Lessee shall place same in good repair at Lessee's expense. If Lessor determines that any part of Equipment is lost, stolen, destroyed or damaged beyond repair, Lessee shall, at Lessee's option, do one of the following: (a) place such Equipment in good repair, condition and work order, acceptable to Lessor, or (b) replace such Equipment with like Equipment in good repair, acceptable to Lessor, and furnish to Lessor all necessary documents vesting good and marketable title thereto in Lessor unencumbered by any lien or security interest, which replacement Equipment shall thereupon become the property of Lessor and be subject to the terms and conditions of this Lease[,] or (c) pay Lessor therefor in cash the "Stipulated Loss Value" of such Equipment, defined as all rent and other amounts due and to become due under the Lease with respect to such Equipment, plus twenty percent (20%) of the actual cost of said item of Equipment, specified in this Lease applicable thereto, representing Lessor's minimum residual value in the Equipment at the end of the Lease term. Upon Lessor's receipt of payment as set forth above, Lessee shall be entitled to title in the Equipment AS-IS and WHERE-IS and without warranty, express or implied.

**16. ENCUMBRANCES AND TAXES.** Lessee shall keep the Equipment free and clear of all levies, liens and encumbrances…. Lessee shall also pay all taxes arising out of Lessee's exercise of any purchase option relating to any Lease (including sales tax).

**18. RETURN OF EQUIPMENT.** Upon expiration of the term of any Lease, (unless Lessee shall have duly exercised any purchase option with respect to such Lease), or after default, on demand by Lessor, Lessee will at its sole cost and expense deliver the Equipment (in the same condition as when delivered to Lessee, reasonable wear and tear resulting from authorized use thereof alone excepted) to Lessor's premises set forth above or any place designated by Lessor in writing, for such disposition as

Lessor may determine.  No such return shall constitute termination of this Lease unless Lessor shall agree so in writing.

**21.  DEFAULT.**  Any of the following events or conditions shall constitute an event of default hereunder:  (a) nonpayment of any rental payment or other amount provided for in any Lease; (b) default by Lessee in the performance of any other obligation term or condition of any Lease; (c) default by Lessee in the payment or performance of any other indebtedness or obligation now or hereafter owed by Lessee to Lessor under any other agreement or instrument, which default has not been waived;…(l) any default occurs under any agreement now or hereafter securing any Lease….

**22.  REMEDIES OF LESSOR.**  Upon the occurrence of any Event of Default and at any time thereafter, Lessor may without demand or notice to Lessee and without terminating or otherwise affecting Lessee's obligations hereunder exercise one or more of the following remedies, as Lessor in its sole discretion shall elect:  (a) Lessor may sue for and recover from Lessee the sum of all unpaid rents and other payments due under each lease then accrued, all accelerated future payments due under each Lease, discounted to their present value at a discount rate of four percent (4%) as of the date of default, less the net proceeds of disposition, if any, of the Equipment; (b) require Lessee to assemble the Equipment and make it available to Lessor at a place designated by Lessor as provided in Paragraph 18 above; (c) take and hold possession of the Equipment and render the Equipment unusable, and for this purpose enter and remove the Equipment from any premises where same may be located without liability to Lessee for any damage caused thereby; (d) sell or lease the Equipment or any part thereof at public or private sale…; (e) use and occupy the premises of Lessee for the purpose of taking, holding, reconditioning, displaying, selling or leasing the Equipment, without cost to Lessor or liability to Lessee; (f) proceed by appropriate action either at law or in equity to enforce either performance by Lessee of the covenants of this Lease or to recover damages for the breach of such covenants; or (g) exercise any and all rights accruing to a lessor under any applicable law upon a default by Lessee….  Without limiting any of the foregoing remedies, Lessor may immediately recover the following from Lessee:  (A) all unpaid rentals, late charges and other sums due as of the date of default; (B) all unpaid rentals to become due from the date of default through the last day of the term of each Lease; (C) any and all costs or expenses paid or incurred by Lessor in connection with the repossession, holding, repair, reconditioning and subsequent sale, lease or other disposition of the Equipment, including but not limited to attorney's fees and costs, whether or not litigation is commenced; (D) the residual value of any item of Equipment which Lessee fails to return to Lessor as provided above or converts or destroys, or which Lessor does not or is

6

unable to repossess; (E) all other costs or expenses paid or incurred by Lessor at any time in connection with the execution, delivery, administration, amendment and enforcement or exercise of any of the Lessor's rights and remedies under each Lease, including but not limited to, attorneys' fees and costs, whether or not litigation is commenced, and taxes imposed by any governmental agency; (F) any actual or anticipated loss of federal or state tax benefits to Lessor (as determined by Lessor) resulting from Lessee's default or Lessor's repossession or disposition of the Equipment; and (G) any and all other damages proximately caused by Lessee's default….

All rights and remedies of Lessor under each Lease are in addition to all rights and remedies contained in any other agreement, instrument or document [] available to Lessor at law or in equity[.] All such rights and remedies are cumulative and not exclusive and may be exercised successively, concurrently and repeatedly. No default by Lessee or action by Lessor, including repossession, sale or releasing of Equipment, shall result in or constitute a termination of each Lease unless Lessor so notifies Lessee in writing, and no termination hereof shall release or impair any of Lessee's obligations hereunder. No exercise of any right or remedy shall constitute an election of remedies and preclude exercise of any other right or remedy….

**30. MISCELLANEOUS.** Time is of the essence of each Lease and of each and all of its provisions…. By execution hereof, the signer hereby certifies that he has read this Master Lease and any Schedule executed concurrently herewith, and that he is duly authorized to execute this Master Lease and each Schedule on behalf of Lessee. ANY AMENDMENT TO THIS MASTER LEASE AND/OR SCHEDULE TO BE EFFECTIVE MUST BE IN WRITING SIGNED BY LESSOR AND LESSEE. This Master Lease constitutes the entire agreement between the parties hereto with respect to the leasing of the Equipment.

Doc. #82-12.

On the same day Nostrum Laboratories executed the agreement, the parties executed Lease Schedule No. 140869-001. Doc. #80-1, at 7-8. Between January 2012 and October 2013, Nostrum Laboratories and Balboa executed six additional lease schedules. *Id.* at 9-20. Quarterly payments for the equipment, as set forth in the lease schedules, ranged from roughly $24,000 to $64,000. *Id.* at 7-20. The lease schedules financed, among other things, pharmaceutical manufacturing and labeling equipment, furniture, information technology equipment, carpeting, building fixtures, installation

7

fees, services, and delivery charges.  *Id.*  Nostrum Pharmaceuticals provided Balboa with a guaranty of Nostrum Laboratories' lease obligations.  Doc. #82-14.

It is undisputed Nostrum paid Balboa (or Balboa's assignee) all quarterly lease payments set forth in the seven lease schedules.  Doc. #80, at 6; Doc. #88, at 3.  It is further undisputed that, at least 120 days before the end of the base term in each lease schedule, Nostrum sent, via certified mail, notice to Balboa stating Nostrum intended to take ownership of the equipment financed by the lease at the end of the base term for a nominal fee of one dollar.  *See* Doc. #48, at 16; Doc. #80, at 6; Doc. #81-28, at 3, 5, 7, 11, 13; Doc. #82-15; Doc. #88, at 3-4.  Balboa's corporate representative admitted Nostrum's "written notice was given properly to terminate."  Doc. #80-3, at 2.

On September 15, 2014, Balboa responded to Nostrum Laboratories' first notice with a payoff quote of $257,950.35 for the termination of the first lease agreement.  Doc. #81-27.  This amount consisted of $240,850 for the residual value to the equipment, and the remainder for sales tax.  *Id.*  Although not specifically proscribed in the agreement, Balboa represents that, as a routine courtesy, it offers lessees the opportunity to purchase the equipment for what Balboa believes to be the equipment's fair market value.  Doc. #81-26, at 3-4.

According to Balboa, on September 25, 2014, Nostrum Laboratories contacted Balboa claiming it only owed one dollar to purchase the equipment.  Balboa disagreed with Nostrum, but agreed to entertain a reasonable counteroffer if Nostrum Laboratories provided documentation reflecting a different fair market value for the equipment.  Prior to the filing of this lawsuit, Balboa did not receive documentation from Nostrum Laboratories concerning the equipment's fair market value.  Doc. #89, at 32.

On September 20, 2016, Balboa sent a proposed complaint to Nostrum, which asserted claims under the agreement, and demanded Nostrum pay more than $2.4 million.  Doc. #47, ¶ 35.  Three days later, Nostrum initiated the above-captioned matter.  Doc. #1.  Nostrum later amended its complaint, seeking declaratory judgment, alleging breach of covenant of good faith and fair dealing, seeking reformation based upon mutual or unilateral mistake, and alleging a claim of promissory estoppel.  Doc. #47.  Balboa asserted twenty-eight counterclaims against Nostrum Laboratories, including breach of the seven lease schedules, claim and delivery of the leased

8

equipment, indebtedness, and conversion. Doc. #48. Balboa also asserted a claim of breach of guaranty against Nostrum Pharmaceuticals. *Id.* Balboa's claimed damages, as of December 31, 2017, were $4,979,140.35. Doc. #80-2. To date, Nostrum Laboratories retains possession of the equipment. Balboa did not ask for return of the equipment until after Nostrum filed this matter.

In June 2017, Balboa moved for judgment on the pleadings, arguing the parol evidence rule barred Nostrum's request for declaratory judgment as well as Nostrum's claims of promissory estoppel and breach of the covenant of good faith and fair dealing. Doc. #53. Balboa also argued Nostrum failed to state a claim for contract reformation. *Id.* Nostrum opposed the motion. Doc. #59. The Court denied Balboa's motion in August 2017. Doc. #65.

Now pending are two summary judgment motions, and a motion to exclude expert testimony. The motions are now ripe for consideration.

## II.  MOTIONS FOR SUMMARY JUDGMENT

Balboa moves for summary judgment in its favor and against Nostrum on Nostrum's claims, and also seeks summary judgment in its favor and against Nostrum on Balboa's counterclaims of breach of contract against Nostrum Laboratories and breach of guaranty against Nostrum Pharmaceuticals. Balboa also asks the Court to find Nostrum is liable for past due rent. Nostrum moves for summary judgment only with regard to Balboa's alleged damages for "past-due rent" and late fees.

### A.  Standard

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v.*

*Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted).  The Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588-89 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984).  "[A] nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial."  *Nationwide Prop. & Cas. Ins. Co. v. Faircloth*, 845 F.3d 378, 382 (8th Cir. 2016) (citations omitted).

### B.  Balboa's Motion for Summary Judgment (Doc. #81)
### (1) Nostrum's Claims Against Balboa
### Parol Evidence Rule

Balboa argues the parol evidence rule bars Nostrum's declaratory judgment claim (Count I), breach of the covenant of good faith and fair dealing claim (Count II), and promissory estoppel claim (Count V).  In Missouri,[6] the parol evidence rule bars extrinsic evidence, including prior and contemporaneous oral agreements that vary or contradict the terms of the final agreement, unless an integrated contract is ambiguous." *Royal Banks of Mo. v. Fridkin*, 819 S.W.2d 359, 361 (Mo. banc 1991) (citation omitted); *see also Jake C. Byers, Inc. v. J.B.C. Invs.*, 834 S.W.2d 806, 811 (Mo. Ct. App. 1992). "An ambiguity exists when there is more than one reasonable interpretation that can be gleaned from the contract language," and "the terms are susceptible of more than one meaning so that reasonable persons may fairly and honestly differ in their construction of the terms."  *Whitehall v. Whitehall*, 218 S.W.3d 579, 584 (Mo. Ct. App. 2007) (citations omitted).  Absent an ambiguity, the intent of the contract "is to be ascertained from the four corners of the instrument without resort to extrinsic evidence."  *Id.* at 585 (citations omitted).

Before applying the parol evidence rule, this Court must first determine whether the agreement is integrated.  *Rosenfeld v. Boniske*, 445 S.W.3d 81, 87 (Mo. Ct. App. 2014) (citation omitted).  "A written agreement is integrated if it represents a final

---

[6] As with the parties' briefing on the motion for judgment on the pleadings, the parties rely upon Missouri law.  The Court will do the same.

expression of one or more terms of the agreement." *Id.*; *see also Multivac, Inc. v. Rotella's Italian Bakery, Inc.*, Case No. 14-1003-ODS, 2016 WL 1030150, at *5 (W.D. Mo. Mar. 10, 2016) (citation omitted). To determine whether a writing is integrated, the Court must look to the face of the document without considering the surrounding facts and circumstances. *Id.* (citation omitted). "If the document appears to be a complete agreement on its face, it is conclusively presumed to be the final and complete agreement between the parties." *Id.* (citation omitted). "The parol evidence rule is particularly applicable where the writing contains a merger or integration clause." *Id.* at 88 (citation omitted); *see also Smiley v. Gary Crossley Ford, Inc.*, 859 F.3d 545, 553 (8th Cir. 2017) (citation omitted).

The agreement states: "This Master Lease constitutes the entire agreement between the parties hereto with respect to the leasing of the Equipment." Doc. #82-12, at 4, ¶ 30. Balboa argues this provision evinces the parties' intention that all prior and contemporaneous agreements be merged into the agreement, and therefore, provides an additional reason for applying the parol evidence rule. *See Rosenfeld*, 445 S.W.3d at 88. Nostrum, in responding to Balboa's motion, did not address whether the agreement was integrated. Doc. #89. By failing to respond to this argument, Nostrum waived any argument to the contrary. *See Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014) (citing *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734-35 (8th Cir. 2009)). Based upon its review of the agreement and Nostrum's failure to oppose Balboa's argument that the agreement is integrated, the Court finds the agreement is integrated.

But the Court's analysis does not conclude with a finding that the agreement is integrated. If the contract is integrated, the parol evidence rule will <u>not</u> bar extrinsic evidence if the contract is ambiguous. *Royal Banks*, 819 S.W.2d at 361 (citation omitted); *Exec. Bd. of Mo. Baptist Convention v. Carnahan*, 170 S.W.3d 437, 448 (Mo. Ct. App. 2005) (citation omitted). When a contract is ambiguous, a court may resort to extrinsic evidence to resolve the ambiguity. *Lafarge N. Am., Inc. v. Discovery Grp., LLC*, 574 F.3d 973, 979 (8th Cir. 2009) (citation omitted).

Whether a contract is ambiguous is a question of law. *Lafarge N. Am.*, 574 F.3d at 979. "A contract is ambiguous when the terms are susceptible of more than one

11

reasonable meaning." *Weitz Co. v. MH Washington*, 631 F.3d 510, 524 (8th Cir. 2011) (citation omitted). "When determining whether an ambiguity exists, the parol evidence rule does not exclude proof that an alleged contract omits a fundamental assumption upon which the agreement is made." *Withers v. City of Lake St. Louis*, 318 S.W.3d 256, 261 (Mo. Ct. App. 2010) (citation omitted). This is perhaps because the "cardinal rule in interpretation of a contract is to ascertain the intention of the parties and give effect to that intention." *Lafarge N. Am.*, 574 F.3d at 979 (citation omitted). "A latent ambiguity will be found to exist when a contract on its face appears unambiguous, but some collateral matter makes the meaning uncertain." *Withers*, 318 S.W.3d at 262 (quotation omitted). Latent ambiguities "must be developed by extrinsic evidence to demonstrate the real intent of the parties." *Id.* (citation omitted).

Nostrum argues the agreement omitted a fundamental assumption – that Nostrum would be permitted to purchase the equipment for a nominal fee at the conclusion of the lease agreement's base term, and the agreement was based upon that fundamental assumption. Nostrum also contends the agreement is ambiguous. Balboa disagrees, contending this alleged assumption by Nostrum was not the basis of the agreement, and Balboa did not intend to agree to such an agreement. Balboa maintains the agreement is not ambiguous.

The Court finds the agreement is ambiguous. Whether the agreement omitted a fundamental assumption is disputed by the parties. The parties' intentions for the agreement is disputed. And the meaning of certain terms is disputed. At a minimum, the agreement is ambiguous with regard to its use of the phrase "purchase option." The agreement also appears to be ambiguous as to the requirements for terminating a lease (particularly with regard to whether the equipment must be returned), and what "residual value" means. Once a contract is deemed ambiguous, a question of fact arises, and the issue is reserved for the jury. *Weitz*, 631 F.3d at 524 (citing *Graham v. Goodman*, 850 S.W.2d 351, 354 (Mo. banc 1993)). The parol evidence rule will not bar extrinsic evidence to resolve ambiguities in the contract. *Royal Banks*, 819 S.W.2d at 361.

## **Declaratory Judgment Claim (Count I)**

In Count I, Nostrum asks the Court to declare (1) Balboa is not the correct party in interest because the leases were assigned to third parties, (2) Nostrum Laboratories' existing and ongoing contractual rights to acquire full ownership of the equipment for a nominal fee, and (3) Nostrum Laboratories owes no further amounts except for a nominal fee under each lease.

In response to Balboa's motion, Nostrum, in a footnote, argues Balboa does not seek summary judgment on Nostrum's request for a declaration that Balboa is not the correct party in interest because the leases were assigned to third parties. Doc. #89, at 43. Accordingly, Nostrum argues the Court cannot grant summary judgment on Count I in its entirety. *Id.* Although Nostrum filed a summary judgment motion, Nostrum did not raise the issue of Balboa's standing to enforce the agreement and lease schedules in the motion.

Nevertheless, in response to Nostrum's argument, Balboa provided releases executed by the entities to which Balboa assigned its rights, titles, and interests in the base term payments due under the lease agreements. Doc. #93-3, at 7-13. The releases confirm the assignees were paid in full pursuant to the assignment by Balboa, and they released any and all rights, titles, and interests they had in the collateral or the residual. *Id.* Without contrary evidence in the record, the Court finds Balboa is the real party in interest.

The Court finds genuine issues of material fact prevent entry of summary judgment in favor of Balboa on whether Nostrum Laboratories has a contractual right to acquire ownership of the equipment for a nominal fee, and what, if anything, Nostrum Laboratories owes. Accordingly, Balboa's motion for summary judgment on Nostrum's declaratory judgment claim is denied.[7]

---

[7] Although not addressed by the parties, Nostrum's declaratory judgment claim involves similar (if not the same) issues and facts as Balboa's counterclaims against Nostrum Laboratories for breach of contract. When a matter involves legal and equitable claims with common issues, both claims are tried to a jury. *Smith Flooring, Inc. v. Pa. Lumbermens Mut. Ins. Co.*, 713 F.3d 933, 937-38 (8th Cir. 2013) (citation omitted). "In this way, the jury's verdict will conclusively settle these common issues, and only issues peculiar to the equitable claim will be left to be decided by the judge." *Id.* (citation omitted).

13

**Breach of Covenant of Good Faith and Fair Dealing Claim (Count II)**

In Count II, Nostrum contends Balboa "intentionally and purposely prevented Nostrum Laboratories from realizing the benefit under the parties' agreement by refusing to recognize Nostrum Laboratories' right to acquire the equipment…for a nominal fee." Doc. #47, ¶ 48. Balboa argues Count II is barred by the parol evidence rule.

"Under Missouri law, a duty of good faith and fair dealing is implied in every contract." *Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Tr. Co.*, 464 S.W.3d 177, 185 (Mo. banc 2015) (citation omitted). The duty of good faith and fair dealing "prevents one party to the contract to exercise a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." *Reliance Bank v. Paramont Props., LLC*, 425 S.W.3d 202, 206-07 (Mo. Ct. App. 2014) (citation omitted). Parties "have an implied duty to cooperate to enable performance of the expected benefits of the contract and this duty is an enforceable contract right." *Id.* (citation omitted). But "there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." *Arbors at Sugar Creek*, 464 S.W.3d at 185 (citation and internal quotation omitted).

The Court refers the parties to its prior discussion about and findings with regard to the parol evidence rule. The Court's review of the record reveals there are disputed issues of material fact that preclude entry of judgment as a matter of law with regard to Nostrum's claim of breach of covenant of good faith and fair dealing. Therefore, Balboa's motion for summary judgment on this claim is denied.

**Promissory Estoppel Claim (Count V)**

In Count V, Nostrum alleges Balboa led Nostrum to believe that, upon expiration of the leases, Nostrum would obtain ownership of the equipment for a nominal fee. Doc. #47, ¶ 68. Balboa argues it is entitled to judgment on this claim because it violates the parol evidence rule.

To establish a promissory estoppel claim, a party must show: "(1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (citations omitted). The promise must be definite, and it must be made in a contractual sense. *Id.* (citation omitted).

Once again, the Court refers the parties to its prior discussion about and findings with regard to applicability of the parol evidence rule. The Court's review of the record reveals there are disputed issues of material fact that preclude entry of judgment as a matter of law with regard to Nostrum's promissory estoppel claim. Accordingly, Balboa's motion for summary judgment on this claim is denied.

### Reformation Based on Unilateral Mistake (Count IV)

Balboa also seeks summary judgment on Nostrum's claims for reformation of contract based upon mistake. In Count IV, Nostrum alleges the parties wanted a standard capital lease arrangement, and agreed Nostrum would be able to acquire ownership of the equipment for a nominal fee upon the conclusion of the lease payments. Doc. #47, ¶ 61. Nostrum alleges the "purchase option was a basic assumption" upon which the parties based their bargain. *Id.*, ¶ 62. Nostrum "was mistaken in believing that the formal lease agreements – which contain several pages of miniscule and blurry writing – contained an express provision reflecting the parties' agreement for the purchase option." *Id.*, ¶ 63. Nostrum contends Balboa "was either additionally mistaken as to the specifics of the formal lease agreement, or wrongfully proceeded with the transaction knowing that Nostrum Laboratories was mistaken about the specifics of the formal lease agreement." *Id.*, ¶ 64. Nostrum alleges the agreement does not accurately set forth the terms of the actual agreement, and fails to incorporate the parties' true intentions, and therefore, seeks reformation of the agreement. *Id.*, ¶¶ 65-66. Balboa contends Nostrum fails to state a claim for relief based upon unilateral mistake, and any mistake was solely due to Nostrum's negligence or inattention.

A unilateral mistake exists "when only one party has an erroneous belief as to the facts." *R & R Land Dev., L.L.C. v. Am. Freightways, Inc.*, 389 S.W.3d 234, 240 (Mo. Ct.

App. 2012) (quoting *Landers v. Sgouros*, 224 S.W.3d 651, 664 (Mo. Ct. App. 2007)). A unilateral mistake "is not usually an adequate basis for relief." *Id.* (citation omitted). There must be evidence the other party "knew or had reason to know of the mistake," and the mistake "must be on a vital matter." *Id.* (citation omitted). The Court's review of the record reveals there are disputed issues of material fact precluding entry of judgment as a matter of law with regard to Nostrum's request for reformation based upon unilateral mistake. Thus, Balboa's motion for summary judgment on this claim is denied.[8]

### (2) Balboa's Counterclaims

Balboa seeks summary judgment on its breach of contract claims, its breach of guaranty claim, and asks for judgment as a matter of law finding Nostrum liable for past due rent and return of the equipment. As noted above, Balboa's counterclaims for breach of contract and breach of guaranty involve similar (if not the same) issues and facts as Nostrum Laboratories' declaratory judgment claim. In addition, Balboa's request for judgment as a matter of law with regard to what Nostrum owes is intertwined with Nostrum's motion for partial summary judgment. For the same reasons set forth in the Court's analysis of Balboa's motion for summary judgment on Nostrum's claims (*see supra*) as well as its analysis of Nostrum's motion for partial summary judgment (*see infra*), the Court finds genuine issues of material fact prevent entry of judgment in Balboa's favor on these counterclaims.

### C. Nostrum's Motion for Partial Summary Judgment (Doc. #79)

Nostrum seeks summary judgment on Balboa's alleged damages for past-due rent and late fees. Specifically, Nostrum asks the Court to enter partial summary judgment finding Balboa's damages for its counterclaims are limited to the equipment's fair market value, or the equipment's stipulated loss value, plus any applicable statutory

---

[8] Balboa also seeks summary judgment on Nostrum's claims for reformation based on mutual mistake (Count III). In response to Balboa's motion, Nostrum conceded it is no longer pursuing Count III. Doc. #89, at 4. Accordingly, Count III is dismissed.

pre-judgment interest. Doc. #80, at 4. Nostrum also asks the Court to find Balboa cannot recover past-due rent and late fees.

There are several undisputed facts underlying Nostrum's motion. First, Nostrum made all quarterly rent payments referenced in the seven lease agreements. Second, Nostrum provided timely written notices of termination for each lease schedule. Third, the agreement contains no requirement that Nostrum pay fair market value for the equipment at the end of the scheduled lease payments. Doc. #80, at 2; Doc. #88, at 2. But genuine issues of material fact prevent the Court from entering summary judgment in favor of Nostrum on Balboa's damages theory. Critically, what, if anything, Nostrum owes Balboa following Nostrum's termination notices remains in dispute.[9] Accordingly, the Court denies Nostrum's motion for partial summary judgment.

### III. DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY (Doc. #83)

Nostrum Laboratories designated Dr. Nirmal Mulye to provide an opinion on the fair market value of the equipment at issue. Specifically, Dr. Mulye's report and testimony concern Balboa's claimed damages. Balboa moves to exclude Dr. Mulye's testimony because (1) he is not qualified; (2) his opinion is biased; (3) his methodology is speculative, unreliable, and non-existent; and (4) his principles and methods cannot be reliably applied to this case's facts. Nostrum opposes the motion.

#### A. Standard

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will

---

[9] It also remains unclear if Balboa intends to seek damages for breach of contract or conversion. Although not addressed by the parties, it appears Balboa may not be entitled to "double damages for a single injury based on alternative theories of recovery." *Cole v. Control Data Grp.*, 947 F.2d 313, 320 (8th Cir. 1991) (citations omitted); *see also Citimortgage, Inc. v. K. Hovnanian Am. Mort., LLC*, No. 12CV1852, 2013 WL 5355471, *3 (E.D. Mo. Sept. 20, 2013) (noting "[t]he economic loss doctrine bars tort claims where the substance of the claims is for the recovery of losses arising out of the parties' contractual relationships.") (internal quotation and citation omitted).

help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). The Court uses a three-part test when determining the admissibility of expert testimony:

First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted). "Courts should resolve doubts regarding usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) (citations omitted).


**B. Qualifications**

Balboa argues Dr. Mulye is not qualified to testify about the fair market value of the equipment at issue. According to Balboa, Dr. Mulye is not an expert in valuing used pharmaceutical equipment, he has never served as an expert, and his familiarity with pharmaceutical equipment is based upon his business and his willingness to purchase and sell equipment at certain prices. Balboa maintains Dr. Mulye is not qualified by "skill, training, experience, or education" to be an expert on valuation of the equipment. Balboa also argues Dr. Mulye's status as an owner does not automatically qualify him to testify about the equipment's fair market value.

Since 2006, Dr. Mulye has served as founder, chairman, and Chief Executive Officer of Nostrum Laboratories. Doc. #83-1, at 1. Since 2007, Dr. Mulye has "made all of the principal decisions regarding the purchase, sale and lease of all new and used

pharmaceutical equipment" at the Kansas City facility. *Id.* Dr. Mulye is responsible for formulating generic pharmaceutical products in the Kansas City facility. He also works with the facility's personnel and Food and Drug Administration ("FDA") officers "concerning FDA compliance and product approvals relating to [Nostrum Laboratories'] products and the machinery, equipment and processing related thereto at the Kansas City facility." *Id.* Dr. Mulye maintains he has "intimate familiarity with the pharmaceutical machinery and other equipment" located in Kansas City. *Id.*

In addition to his experience at Nostrum Laboratories, Dr. Mulye has worked in the specialty pharmaceutical industry for more than twenty-five years. *Id.* While working in the industry, Dr. Mulye has gained familiarly with comparable equipment for manufacturing, quality control, research, and development of specialty pharmaceutical products. *Id.* Dr. Mulye has "extensive knowledge of industrial pharmaceutical product development, compliance and regulatory requirements and all machinery and equipment related thereto." *Id.*

Nostrum contends Dr. Mulye is qualified to testify about the fair market value of the equipment at issue because Missouri courts routinely permit property owners to opine on the value of their properties, regardless of expertise or qualifications. Given his status as an owner (or lessee) of the property and his familiarity with the equipment, Nostrum argues Dr. Mulye is qualified to testify about the fair market value of the equipment at issue.

Based upon his personal knowledge of and experiences with the equipment, Dr. Mulye will be permitted to testify as a lay witness under Rule 701 of the Federal Rules of Evidence, and offer his opinion about the value of the equipment at issue. *United States v. Smith*, 591 F.3d 974, 982 (8th Cir. 2010) (stating "[p]ersonal knowledge or perceptions based upon experience is sufficient foundation for lay testimony.") (internal quotations and citations omitted); *see also State ex rel. Mo. Highway & Transp. Comm'n v. Menley*, 778 S.W.2d 9, 10-11 (Mo. Ct. App. 1989) (stating "[t]he owner has the benefit of a presumption that he is familiar with the property and has a basis for his opinion of its fair market value.") (citation omitted); *Tull v. Hous. Auth. of City of Columbia*, 691 S.W.2d 940, 943 (Mo. Ct. App. 1985) (citation omitted).

Whether Dr. Mulye qualifies as an expert under Rule 702 of the Federal Rules of Evidence is a different question. Nostrum argues Dr. Mulye is qualified to provide expert testimony on the equipment's fair market value because of his specialized knowledge, education, experience, and familiarity with the equipment. Based upon the record presented at this time, the Court finds Dr. Mulye possesses the requisite experience and knowledge to be an expert regarding the fair market value of the equipment at issue. Doc. #83-1, at 1-2; Doc. #83-2, at 9, 11-22; Doc. #84-4, at 2-4. Accordingly, Balboa's request to exclude Dr. Mulye's expert testimony on the basis of his qualifications is denied.

### C. Bias[10]

Balboa also argues Dr. Mulye's testimony should be excluded because his opinion is biased. According to Balboa, "it is impossible to ignore Dr. Mulye's significant personal and financial interests in this case." Doc. #83, at 10. Nostrum Pharmaceuticals (for which Dr. Mulye serves as president) owns all shares in Nostrum Laboratories. Nostrum Pharmaceuticals signed a guaranty securing Nostrum Laboratories' lease obligations to Balboa. Both entities could be liable for the value of the equipment and/or alleged unpaid rent.

"Determining the credibility of a witness is the jury's province, whether the witness is lay or expert." *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004) (citation omitted). The jury hears the witness's testimony, and evaluates "facts bearing on the witness'[s] deficiencies." *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000) (citation omitted). "An expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out in cross-examination." *Id.* (citation omitted). The Court will permit Dr. Mulye to testify. If Nostrum calls Dr. Mulye to testify as an expert witness, Balboa will be permitted to elicit testimony and present evidence of bias, if any, during cross-examination. The jury will determine whether Dr.

---

[10] Balboa seems to suggest Dr. Mulye's testimony is biased <u>and</u> selective. Other than indicating Dr. Mulye's report contained the fair market value of "select pieces" of equipment, Balboa did not provide any legal or factual argument from which the Court could exclude Dr. Mulye's testimony on the basis of it being selective. As such, the Court declines to consider that basis for excluding Dr. Mulye's testimony.

Mulye's opinion is biased or not. Balboa's motion to exclude Dr. Mulye's expert testimony on the basis is denied.

### D. Methodology

Balboa moves to exclude Dr. Mulye's testimony on the basis of his methodology. Specifically, Balboa argues Dr. Mulye's testimony should be excluded because (1) his valuations are based on Nostrum Laboratories' perspective on potential price for selling or buying, (2) his opinion indicates there is a limited market for the equipment but also recognizes a secondhand market for the equipment, (3) he did not consider third-party appraisal services, (4) he did not contact other companies or used equipment dealers to inquire about the amount they may pay for the equipment, and (5) he failed to undertake any depreciation calculation when determining the fair market value. Balboa's arguments on Dr. Mulye's methodology attack the factual basis – or lack of factual basis – of his opinion.

The Eighth Circuit has admonished district courts that weigh or assess the correctness of an expert's opinion. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) (citation omitted). "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Id.* (quoting *Daubert,* 509 U.S. at 590). An expert opinion should be excluded only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007).

Moreover, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1014 (8th Cir. 2012) (citation omitted). A party's dispute with an expert's methodology or the facts or documents upon which the expert relied (or did not rely) does not result in exclusion of the expert's testimony. *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 739 (8th Cir. 2000) (finding the district court did not err in admitting experts' conflicting testimonies, and leaving the jury to decide which expert's theory was

sounder).  The disagreeing party should utilize cross-examination to attack the expert's testimony.  *Synergetics*, 477 F.3d at 956 (citations omitted).

In his report, Dr. Mulye states he used the fair market value approach to determine the value of the equipment.  Doc. #83-1, at 2.  He defined fair market value as "the amount at which property might exchange between a willing buyer and a willing seller, neither being under abnormal pressure, each with full knowledge of all relevant facts and with equity to both."  *Id.*  Dr. Mulye's principal valuations relate to the "used nature of the machinery and equipment that have been utilized on a regular basis…over several years."  *Id.*  Dr. Mulye's valuations were also based upon his personal, historical, and current knowledge of the equipment, and his experience with the markets for new and used machinery and equipment.  *Id.*

Dr. Mulye's report lacks evidence from actual sales of equipment.  But that may be because of the nature of the equipment.  That is, once pharmaceuticals touch the equipment or the equipment is exposed (even through the air) to pharmaceuticals, the machine "has to go through a process called passivation" before the machine can be sold to anyone else.   Doc. #84-4, at 2.  According to Dr. Mulye, "passivating the machine" consists of "using various assets and treatment to make sure there are no lesser views of the drugs that it was previously worked with or if it had come in contact with."  *Id.* at 2.  The passivation can become a "nearly impossible task if it's a very sensitive or complicated machine…."  *Id.*

The Court finds Dr. Mulye's opinion rests on good grounds based upon Dr. Mulye's experience and expertise with the equipment and industry.  Further, Dr. Mulye's opinion, based upon the record before the Court, is not "so fundamentally unsupported that it can offer no assistance to the jury."  *Synergetics*, 477 F.3d at 956.   If Nostrum calls Dr. Mulye as an expert witness, Balboa will have the opportunity to cross-examine Dr. Mulye with regard to his methodology and/or the facts he utilized.  The jury will have to decide if Dr. Mulye's methodology was sound.  For these reasons, Balboa's motion to exclude Dr. Mulye's testimony based upon his methodology is denied.

## E. Reliability

Balboa argues the Court should exclude Dr. Mulye's testimony because his principles and methods cannot be reliably applied to the facts of this case. Balboa contends "Dr. Mulye's testimony is the precise type of unreliable, 'it's true because I said it's true[,]' opinion testimony that Rule 702 and the courts interpreting it strive to prevent from reaching jurors." Doc. #83, at 16.

The Supreme Court has explained reliability means trustworthiness. *Daubert*, 509 U.S. at 591 n.9); *Kuhn v. Wyeth*, 686 F.3d 618, 625 (8th Cir. 2012) (citation omitted). "The standard for judging the evidentiary reliability of expert evidence is lower than the merits standard of correctness." *Kuhn*, 686 F.3d at 625. A proponent of an expert's testimony "need not demonstrate that the assessments of [its] experts are correct." *Id.* (citation omitted). When evidence is admissible but "shaky," "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" that evidence. *Id.* (quoting *Daubert*, 509 U.S. at 596).

Based upon the record before it, the Court finds Dr. Mulye's opinion meets the low threshold of showing evidentiary reliability in that it appears trustworthy. If Nostrum calls Dr. Mulye as an expert witness, Balboa will be permitted to question Dr. Mulye about his methodology and the reliability (or unreliability) of his methodology during cross-examination. Accordingly, Balboa's motion to exclude Dr. Mulye's testimony because his methodology is allegedly unreliable is denied.

## F. Relevance

In its reply, Balboa argues Dr. Mulye's opinions are not relevant to the fair market value at the time of the conversion, and therefore, do not aid the trier of fact. Doc. #87, at 2. Dr. Mulye's opinions were not rendered at the time the equipment was allegedly converted by Nostrum, which according to Balboa, is the effective date for the measure of damages for conversion (assuming Balboa seeks damages for conversion). Balboa argues the conversion of the equipment occurred between February 2015 and December 2015, depending on the expiration of the base term. *Id.* at 3. But Dr. Mulye's report was based upon what he believed the fair market value of the equipment

23

was in April 2017.  Because of the gap in time, Balboa contends Dr. Mulye's opinion "artificially depresses the value" of the equipment by not identifying the value at the time of alleged conversion.  *Id.* at 3.  This argument was not included in Balboa's motion, and for this reason alone, the Court denies the motion to strike Dr. Mulye's testimony on this basis.

Even if the Court were to consider this argument, it would still deny the motion. As stated above, the factual basis of an expert's opinion goes to credibility, not admissibility.  *Synergetics, Inc.*, 477 F.3d at 955-56.  If the opposing party disputes an expert's methodology, facts, or the documents upon which the expert relied, it should cross-examine the expert.  *Id.* at 956.  In doing so, the opposing party, attacks the expert's opinion and credibility.  If Nostrum calls Dr. Mulye as an expert witness, Balboa will be permitted to question Dr. Mulye about the factual basis for his opinion, including, but not limited to, the length of time between the alleged conversion and the date of his report, and any disputes with regard to his valuation of the equipment.

## IV.    CONCLUSION

For the foregoing reasons, Balboa's motion for summary judgment is denied, Nostrum's motion for partial summary judgment is denied, and Balboa's motion to exclude expert testimony is denied.  Count III (reformation based upon mutual mistake) is dismissed.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE:  June 1, 2018                    UNITED STATES DISTRICT COURT